Good morning all. Our first case for argument is Sorensen v. WD-40 Company. Mr. J. Aram. Good morning, Your Honors. Counsel, Ms. Cameron, and may it please the Court. Mr. Sorensen is not here today to prove his case for trademark infringement. Rather, Mr. Sorensen is here today to persuade this Honorable Court that the District Court erred in granting summary judgment in favor of WD-40 on all of Mr. Sorensen's claims for trademark infringement. In doing so, the District Court erroneously concluded that there was not even a single genuine issue of material fact as to whether an ordinary consumer could be confused by Mr. Sorensen's crosshair trademark, an inhibitor trademark, and WD-40's use of a nearly identical crosshair mark and its own use of the term inhibitor. The District Court improperly weighed the credibility of WD-40's testimony against the contradictory statements reflected by the documents and improperly concluded that they were telling the truth when they said they didn't copy the trademarks at issue in this case. In addition to this Court's prior decisions, which we'll talk about in a minute, which have made fairly clear that summary judgment in trademark cases are disfavored, the United States Supreme Court's ruling last month provides significant support for Mr. Sorensen's position that summary judgment was simply inappropriate in this case because the ultimate analysis of whether an ordinary consumer would be confused by WD-40's use of crosshairs on products that serve the same purpose as my client's products are sold across the United States only by WD-40. These are questions that, in the words of Justice Sotomayor, are comfortably within the can of a jury. Put another way, in the entire universe of logos and names that it could have chosen to brand its then new line of products, WD-40 decided to choose the exact crosshair logo already employed by a company that it had considered partnering with, Mr. Sorensen's company, my client, and then decided to use that company's name to brand one of its new products. Despite all of that, Your Honors, the district court decided as a matter of law that there is no likelihood of confusion in this case. This case essentially presents two issues that I think the parties appear to agree on, at least. First, whether WD-40's crosshair trademarks are confusingly similar to Mr. Sorensen's senior use of nearly identical crosshair marks. And second, whether or not WD-40 is entitled to a fair use of the term inhibitor on one of its products in light of Mr. Sorensen's longstanding registered trademark. With respect to likelihood of confusion, a court in this circuit analyzes seven factors that were discussed at length in Judge Mannion's opinion in AutoZone. Those seven factors are the similarity of the marks, the similarity of the products, area and manner of concurrent use, the degree and care likely to be exercised by consumers, the strength of Mr. Sorensen's mark, any actual confusion, and the intent of the defendant to palm off his product as that of another. And as this court stated in AutoZone, the courts may assign varying weight to each of these factors depending on the facts presented in each case. Mr. Sorensen submits that there are many genuine issues of material fact as to each of these factors that should have precluded summary judgment below. This court has also noted on occasion that there are three factors that are particularly important in the likelihood of confusion analysis. Those three factors are the intent to palm off factor, the similarity of the marks, and actual confusion. With regard to the intent to palm off factor, Mr. Sorensen points out in the briefs, and I'll point out here, that discovery below showed that a third-party consultant, in this case Innovation Edge, provided documents to WD-40, and WD-40 produced these documents and third-party produced these documents, reflecting advice to WD-40 that it could consider a partnership with Mr. Sorensen since WD-40 had never before produced a product containing an ingredient called volatile corrosion inhibitor. Which we refer to as VCI throughout the briefs. Say again, what's the product? Well, the ingredient is called volatile corrosion inhibitor. Really? Yes. Can you say that three times fast? Well, you know, the third word is inhibitor. I'm aware of that, Your Honor. And there are seven or eight products that use this as one of its major ingredients. That's true, Your Honor. And so isn't it just sort of natural that WD-40 would include that as one of the four words in its product? Right. Well, so I think what Your Honor's getting at is, you know, shouldn't they have a fair use of that? Yeah, well, everybody else is using it, so why not? Why can't they use it? Well, whether other potential defendants are infringing on my client's mark, I don't, I think. Yeah, but it's part of the, what do you call it, volatile corrosion inhibitor, right? That's the ingredient, yes. Yeah, that's the ingredient that goes into it, that product, your product, and WD-40. So inhibitor isn't exactly something that your client came up with. Well. Other than using it as the inhibitor, they chose to use it that way, but that's not the way WD-40 uses it. Well, WD-40 is not calling their product the volatile corrosion inhibitor. They're calling it the long-term corrosion inhibitor. And our client, even if you're, in a legal sense, we would submit that it's not a descriptive term. I understand what Your Honor is saying, and it makes a lot of sense. Well, the crosshairs is a closer question, but the name inhibitor is pretty much everybody's word. Well, Judge, obviously, as we set forth in the brief, we think there are reasons why they're not entitled to a fair use of it. We think they're using it as a trademark. Our client has acquired secondary meaning through use over many, many years of this term inhibitor. But I would agree with you that the crosshairs argument, the likelihood of confusion argument, is a stronger position. And although I still think that there are a number of issues of fact that remain regarding the fair use question, as we point out in the briefs. I think, and that's an interesting distinction to make because the evidence showed below that there were other potential names. They would call it a rust-preventing spray or something other than incorporating the term inhibitor when it's placed literally centimeters within the crosshairs. So that taken together, I think, removes it from the ambit of a potential fair use. So with regard to, if we go back to likelihood of confusion now with regard to the crosshairs, Mr. Sorensen has been in this space, this VCI space, for a number of years. The advice provided by InnovationEdge to WD-40 was provided well before WD-40 conceived of the infringing products at issue. These documents contain Mr. Sorensen's registered trademark for the inhibitor, as well as his website address, on which he sells all of the products at issue. In the face of this, WD-40 has argued that, and they've maintained throughout this appeal, that they still had no idea who he was, who his products were, who his companies were. However, during a 30B6 deposition that I took of a gentleman named Graham Milner, Mr. Milner was asked the following question and gave the following answer. So it's fair to say at the time WD-40 began selling its specialist product, it had knowledge of my client? Answer, as a potential provider of technology that we had not chosen, yes. Well, WD-40 says, that might be so, that might be the testimony, but the report provided by InnovationEdge didn't contain photographs of Mr. Sorensen's products, so we really didn't have knowledge of it. Well, Mr. Sorensen concedes that these documents, the ones that I've talked about at length in the brief and here today, don't contain photographs of each of his products. But whether or not WD-40 might have visited his website upon receiving these documents or engaged in any other due diligence as a company like that may very well have done during the period in which it was considering a partnership with his company are issues of fact because it goes directly to the company's intent to promote. In discovery, was that inquiry made of whether there was a visit to the website or any other examination of Mr. Sorensen's products? Yes, Your Honor, I did ask. I mean, you specifically referenced that it could have. I'm asking you, does the record reflect that inquiry was made of WD-40, whether they made such, beyond the documents I'm talking about? I understand, Your Honor. I believe I asked that question and a number of others getting to that point, and their testimony throughout was no, they didn't do anything else. However, if we go back to AutoZone, remember in that case Mr. Strick said he had no knowledge of AutoZone. And what the court there said was that you can't just take the testimony at face value. You're allowed to make a reasonable inference. And I believe that the reasonable inference to be drawn here is that when a company is spending lots of money on launching a new product, and in the process of that are investigating the existing market and considering a partnership with a company like my client, and goes out and pays a third party to provide it with advice regarding this client and what their products are like and what their trademarks are like and how they advertise their products, where their products are sold, those types of things, I think the reasonable inference is that they might visit the web page or do something else to actually go look at the products. I'm not questioning your assumption. I'm questioning whether or not you got a direct answer in discovery where they said they did not. No, Judge, I think it was Mr. Milner that I asked that question to. I asked one of the 30B6 deponents that question, and nobody admitted to me that anybody went to the store or that they went to the website to look at the products. It's sort of the inversion of AutoZone, isn't it? AutoZone is the WD-40 is the AutoZone, and this is the opposite. Your company is the obscure one, and AutoZone is sort of the dominant figure. In that respect, Judge, and that's the argument that they make in their brief, in that respect, I think you wouldn't be far off. Yeah, I don't think that's unreasonable to make that argument. However, I think we've still got to go back to the seven factors, and I think this case is not only like AutoZone in a number of respects. I think that there are many more. There's a lot more evidence that the plaintiff in this case has set forth than AutoZone did even in that case. For example, the similarity of the crosshairs here, I think, is more similar than the AutoZone, OilZone, and WashZone marks there. In that case, AutoZone sells products. OilZone and WashZone, I think, was largely service businesses, whereas here, these products, as the district court noted, serve the exact same purpose. They're priced exactly the same. And in AutoZone, I think Strick had a store in Naperville and a store in Wheaton, right, whereas AutoZone obviously was all over the place. Well, you know, I'm not suggesting that my client is WD-40, but my client does sell his products around the country in the same types of stores and in many of the same stores as WD-40. And then if we go a step further, go to the intent to palm off factor, which is important in the inquiry, in AutoZone, Strick said, I never heard of AutoZone at the time I started WashZone and OilZone. The court then noted that in discovery in that case, Mr. Strick testified that he had been in the industry for a number of years. Even though his testimony says he never heard of them, it's quite unlikely that he never did, and noted that that's the reason that this case should go to a jury. These are the kinds of questions that a jury should be asked and the types of issues that a jury should be confronted with. And I think that's why summary disposition was improper in that case, and I think it's inappropriate in this case as well for the same reasons. So if we look at the similarity of the marks, I think it's important here, Your Honor, to look at what WD-40 itself has registered with the USPTO. They registered crosshairs that are nearly identical to Mr. Sorenson's crosshairs, all after receiving these Innovation Edge documents, by the way. Crosshairs that don't contain any emblems in each of the quadrants. Now, I think that their decision to put emblems in each of the quadrants adds to the confusion, but they've argued, well, they're different emblems, so that removes any possibility of confusion. Well, they have told the United States Patent and Trademark Office that the crosshair standing alone creates a unique impression and is inherently distinctive on its own, and the USPTO agreed and they've got a registration for crosshairs that infringe on Mr. Sorenson's crosshairs. So you're a common law, whatever it is, claim of the crosshairs? Sure. Yeah, they have the certification, whatever it is. Right, because we're the senior user, right? I think in the testimony is that Mr. Sorenson has been using it since 1997 consistently throughout the country. And the other point that WD-40 makes at length is that the existence and the appearance of the shield protects WD-40 from any possible consumer confusion. However, whether or not ordinary consumers would recognize the shield more than they would recognize their registered crosshairs is precisely the kind of factual issue that should be made by a jury and not the district court. And then if we go and we take a look at the similarity of these products, even the district court notes, if we were going to win any of the factors below, this seems to be the one that the district court agreed with us on. These products are rust preventatives and they serve the same purpose, to prevent rust. WD-40, again, goes back to the shield argument and says that the shield somehow cuts against any potential finding that the products are similar. But as I pointed out earlier, Mr. Sorenson disagrees that the shield, as a matter of law, can support a finding that these marks are dissimilar. And the shield itself can't distinguish the actual products since they both do the same thing and contain these nearly identical crosshairs right in the middle. They have a distinguishing thing with the specialist issue. You mentioned that where they have, what, seven specialist products? Right. Something new, and I guess your claim is that they were trying to, with this one product that's similar to yours or the same or whatever, they're trying to get your market share. That's partially correct, Your Honor. So what it is is the specialist line has these seven products. All the specialist products bear the crosshairs. So that's really the thrust of the case is there's crosshairs across the entire line of the products. You're in your rebuttal time, you know. Oh, I just, thank you, Judge. Let me just finish answering Your Honor's question and then I'll sit down. There's only one of those products that employs the term inhibitor, which is the long-term corrosion inhibitor product. I'll reserve the remaining time for rebuttal. Ms. Cannon. Good morning, Your Honor. WD-40 has been around since the late 1950s. From the 1950s until the fall of 2009, WD-40 sold one product under the WD-40 brand, under the WD-40 wordmark and the WD-40 shield, and that was the WD-40 multi-use product. Over the course of that time, WD-40 became well-known in American households. Four out of every five Americans has used WD-40, and you can probably find it on almost every garage shelf in America. Maybe not Judge Bowers. I guarantee that. In the fall of 2009, WD-40 decided to leverage the strength and the famousness of the WD-40 marks and launch a new product line. WD-40's specialist product line is the result of that endeavor, and in the fall of 2011, WD-40 launched the WD-40 specialist products, and these are the products that Mr. Sorensen takes issue with today. Our position here is simple. We believe that the lower court issued a reasoned, concise, and well-thought-through opinion, abiding by the CELATIC standard and the Seventh Circuit standards for trademark infringement. Mr. Sorensen has alleged in this appeal that the lower court made mistakes, not drawing inferences that were required and making credibility determinations that were inappropriate. We disagree. Mr. Sorensen is mistaken. The lower court addressed each of the seven elements of a trademark infringement case in the Seventh Circuit according to the appropriate legal standard. Mr. Sorensen unfortunately focuses the majority of his case on the fact that he thinks that trademark infringement occurs when two marks might be similar or, in a layperson's terms, similar to each other. Unfortunately, that is not the standard. There is simply no likelihood of confusion here, and there is no material issue of fact as to any of the seven factors. The first one that Mr. Sorensen's counsel addressed, the intent to palm off. WD-40 took great pains to develop the specialist line of products, and at the top of every one of the specialist products is the WD-40 mark and the WD-40 shield. The place of prominence of the WD-40 marks works at a cross-purpose if WD-40 was trying to palm itself off as Mr. Sorensen. And I think, again, there's a fundamental misunderstanding on the part of Mr. Sorensen with regard to this element. It's not the intent to copy. It's not even knowledge that matters. And I would argue, I argue, actually, that WD-40 didn't have knowledge of Mr. Sorensen, nor does the evidence support any kind of inference that WD-40 did have knowledge of Mr. Sorensen. The documents that counsel refers to over and over again contains the name Van Patten Industries, a company that Mr. Sorensen started and that was involuntarily dissolved by the state of Illinois in 2009. None of those documents contained Mr. Sorensen's name. None of those documents described his products. And contrary to counsel's assertion, there is no evidence to say that WD-40 hired Innovation Edge, its third-party partner, to conduct an IP survey. Indeed, Mr. Sorensen is mistaken. Innovation Edge was hired in order to evaluate technical components that might be used in a potential product line. So WD-40 approached this process simultaneously. There was a technical side that was looking at research into the chemical composition of the products, and that is what Innovation Edge was hired to evaluate. And then there was the branding side. And WD-40 took, again, great pains in order to find a mark, a new mark, a new design, a new label that was worthy of the brand extension that would be WD-40. Remember, this is the first time in the history of the company that they are extending the WD-40 brand, that they're leveraging that mark and putting that coveted, famous mark onto a new product line. WD-40 wants to ensure that the trust that's been built up over the last 60 years with its consumer base would be there in this new product line. WD-40 hired three well-known design firms to create a design for this new product line, and the winning design firm is located in the United Kingdom. Echo Design Group created the label that is on every specialist product, every WD-40 specialist product. There's a declaration from Mr. Nick Dorman, who's the managing director of Echo Design, stating that he had no knowledge of Mr. Sorenson, he had no knowledge of Van Patten Industries, Inhibitor Technology Corporation, any of Mr. Sorenson's products, any of Mr. Sorenson's intellectual property prior to the creation of the design that he created, that his firm created for the WD-40 specialist products. Well, you seem to be saying that the, a little cliche, the right hand didn't know what the left hand was doing. You said something about the engineering people or whatever came across Sorenson, something about ingredient, and then the design people were oblivious to what they were doing over there. Not oblivious, Your Honor. Because that's the only place where the so-called connection was made with the crosshairs. They were working in tandem, definitely working in tandem, in different locations, and not necessarily communicating exactly what they were doing, but they had different tasks at hand, which is why the technical people never evaluated, they never saw Mr. Sorenson's crosshairs. The people who were looking at the VCI product, the technical component to the new product line, simply did not look at Mr. Sorenson's products for his intellectual property. They were looking at the chemical composition in order to try and ascertain. That's what I wanted to clear. Yes, Your Honor. Technical on one side and what's the other side, design or marketing? It would be intellectual property, branding, marketing was the group. Technical and branding. Yes, Your Honor. All right. Yes. And even putting that aside for a second, the legal standard is not knowledge. So even if WD-40 did have knowledge of Mr. Sorenson's crosshairs, even if WD-40 did have knowledge of the words, the inhibitor, WD-40 did not have an intent to palm off its products as those of Mr. Sorenson. Again, WD-40 has built up years and years of goodwill with the consuming public in the United States. Mr. Sorenson has a diminutive brand of products that is distributed in a narrow channel of trade, and Mr. Sorenson has not presented a material issue as regards to the intent to palm off factor. And that's what he hangs his hat on here. That's what he has really honed in on and said that because there was evidence that inhibitor or, excuse me, that Innovation Edge provided WD-40 with information about Mr. Sorenson as a VCI provider, that WD-40 therefore, ergo, had the intent to palm its products off as Mr. Sorenson's, and that is simply not the case. There is no evidence to support that. In fact, the witness testimony provides otherwise. And I would also – Is the otherwise the reverse effect? You seem to imply that actually that Sorenson would be a beneficiary of this similarity. No, you didn't say that. But I'm looking at it and saying, well, you know, with the palm off argument, usually the little guy is trying to latch on to the big one. Well, Your Honor, I don't think Mr. Sorenson would say that he'd be the beneficiary. No, he wouldn't. I was getting that implicit from the argument, that the palm off issue usually is the very small company trying to benefit from a similar big company. Isn't that correct? Usually, yes, Your Honor. And Sorenson focuses on the AutoZone v. Strick case. But in that case, AutoZone had – there was evidence in the record that AutoZone had expended a considerable amount of money on advertising and marketing on a national campaign, on a local campaign in Chicago, to Bulls games, White Sox games, to, you know, to the consuming public in and around the Chicago area. There was also evidence that Mr. Strick had worked in the auto industry before. So he would have been – it's likely he would have been familiar or there could have been an inference drawn that he was familiar with the AutoZone marks. In this case, the facts are different. There's nothing to support an inference of an intent to palm off. So Mr. Sorenson is essentially asking the court to draw an inference from an inference. He's asking the court to first infer that WD-40 had knowledge of all of Mr. Sorenson's intellectual property portfolio and his products. And then Mr. Sorenson is asking the court to infer from that knowledge that there was an intent to palm off and that WD-40 wanted consumers to believe that its new line of products, the WD-40 specialist line of products, derived from or sourced from Mr. Sorenson. There is simply nothing in the record to support such an inference, Your Honors. Ms. Cameron, you placed great emphasis, perhaps correctly so, on the 60 years and the Shield and the brand WD-40. Is it your view that the crosshair is just an accidental placement, even though your view is much more minor to the consumer's eye? How do you think that came about, the crosshair adoption? Your Honor, I do think that it's somewhat of a coincidence. And I think, honestly, that that's the only conclusion that the evidence supports. Because a target or a bullseye is used by hundreds of companies to convey to the consuming public that a product is used for a targeted or a specific purpose. There are multiple registrations, trademark registrations, in the record that we submitted to the court demonstrating that in these international classes, one, which is where Mr. Sorenson's trademark is registered for chemical capsules, international class two, which is those products that are rust preventatives or paints, varnishes, and international class four, which is lubricating products or oils and fuels. There's hundreds, simply hundreds, of trademarks containing some type of a crosshair or a bullseye or something of that sort. And so the consuming public has become very accustomed to distinguishing between these different types of trademarks. WD-40 uses the crosshairs at the bottom of its WD-40 specialist can. So the prominent trademark, the brand that consumers are asked to believe this is the source of, is WD-40. Then the specialist is the sub-brand. The crosshairs come in the same place on every can below both of those brand names. Mr. Sorenson uses his crosshairs inconsistently. And so his request to the court, asking the court to recognize his trademark rights, is essentially asking the court to sanction his artistic license. Mr. Sorenson has used the crosshairs without tools. He's used the crosshairs with tools. He's used the crosshairs as a bullseye. And more currently, and this will go into kind of the next element that Mr. Sorenson's counsel addressed, is the similarity of the products. Mr. Sorenson uses a bullseye in the word inhibitor in place of the O rather than using a crosshairs, any kind of crosshairs, and that's his new packaging or the packaging that he's been kind of phasing in over the last few years. I would also point out that the legal standard for similarity of the products is whether consumers would believe that the products come from the same source. So for each of these elements, as you well know, Your Honors, we're not just talking about a layman's approach to these factors. We're talking about legal standards. So, for example, just now when I was talking about the intent to palm off, we're not just talking about an intent to copy. We're talking about an intent to convey a message to the consuming public because trademark law is all about protecting the public from confusion as to the source of products. This is a consumer protection doctrine, primarily. So with regard to the similarity of the products, we have to look at whether or not consumers would actually believe that the products came from the same source. Is the target on all of the seven or eight specialists? Yes, Your Honor. And there's only one of the – is it seven or eight? There's eight. This one in question, it's the only one that uses the VCI. Yes, Your Honor. So that's the only one that's the same, more or less the same. Yes, Your Honor. But you use the target on all eight of them? Yes. At some point. You say it's more obscure, but whatever it is. I assume it's in the same position on each one of these. Yes, it's used consistently in the same position on each can. And the one product, as Your Honor just pointed out, that WD-40 has that contains VCI technology or volatile corrosion inhibitor technology is the long-term corrosion inhibitor. And that product, Mr. Sorensen sells a VCI product that is an aerosol. He sells one aerosol product, and the prominent trademark on Mr. Sorensen's aerosol VCI product is actually V80. And during testimony, Mr. Sorensen said that he named it V80 because it was twice as good as WD-40. So his inhibitor brand is what's at the top of that aerosol product. It's what's at the top of every one of his products. So the two brands that are really at issue here are the inhibitor line of products and the WD-40 specialist line of products. Consumers do not call Mr. Sorensen's products the Crosshairs product. They don't refer to it as the Crosshairs product. So when we're looking at the element of the similarity of the products, the question would be whether or not consumers might think that Mr. Sorensen's gun sleeves, his gun plugs, his pro-chips, his boat covers, his stretch film, all of the other products that Mr. Sorensen makes might be sourced from WD-40, or whether the analysis actually would be whether the WD-40 specialist products would be considered to be sourced by Mr. Sorensen for consumers. So, again, we go back to this question of the likelihood of confusion as to the source of the products. It's not merely a likelihood of confusion as to the similarity of the marks. And that brings me to the other factor that Mr. Sorensen's counsel spent a considerable amount of time addressing, and that is the similarity of the marks. The legal standard for similarity of the marks is not simply do the marks look alike. The legal standard set forth by this circuit is what is the overall commercial impression created by the marks. So that is, what is the sight, sound, and meaning? And they can't be dissected. So the mark can't be dissected from the manner in which it appears in commerce. How do these marks appear in commerce? They don't appear the way that Mr. Sorensen has presented them to you in his brief. They appear on the label of the products. So the WD-40 specialist products all have the WD-40 brand at the top, the shield, the specialist sub-brand, and then the crosshairs at the bottom. Mr. Sorensen's products have the inhibitor in various places and in various forms, actually, because Mr. Sorensen uses the words the inhibitor and then also uses the words the inhibitor with the crosshairs and with the bullseye, as I explained just a few seconds ago. WD-40, with regard to the similarity of the marks, WD-40 uses not Mr. Sorensen's the inhibitor trademark. WD-40 uses the word inhibitor. As Your Honor pointed out, inhibitor is part of a description for an entire category of products called volatile corrosion inhibitors, which have been around since the 1940s. Multiple different companies, very well-known companies in this industrial space or in this space, commercial space, sell products that they call corrosion inhibitors. And in the record, at Exhibits 16 and 17 in particular, there are photographs from websites containing images of All of these products have the words corrosion inhibitor on the product. So to say that third parties don't use the product or don't use the word or that it's not an industry practice to use the word inhibitor to describe a type of product is simply incorrect. So WD-40 uses the word inhibitor to describe one of its products. And WD-40 has issued precautionary measures by issuing guidelines to all of its employees all over the world saying that that product is always to be referred to as the WD-40 long-term corrosion inhibitor. Does WD-40 have any other products than these, I'll call them aerosol can stuff? Because you point out Sorenson has lots of other products, bigger shields, coatings, things you put in bags and whatever. Does WD-40 have a similar line outside of the aerosol? No, Your Honor. That's it? Yes, Your Honor. So WD-40 has issued this precautionary measure or this guide to its employees saying the WD-40 specialist long-term corrosion inhibitor must always be referred to as such because we don't want brand dilution. We don't want consumers to start calling that product corrosion inhibitor. We want people to call it this WD-40 specialist long-term corrosion inhibitor. I see my time is up. Your Honors, I would ask this Court to affirm the lower court's decision. Thank you. Thank you, Chairman. Your Honors, please, the Court. I have a couple of points to make, but at the outset I would just observe. I mean, the discussion we've been having for the last half hour, particularly with respect to the crosshairs, when read in light of AutoZone in the Hanna Financial case the Supreme Court came out with last month, I mean, just I think clearly demonstrates that if it's a close call, whether the marketing team talked to the technical team, whether they had the intent to use the crosshairs or not, or whether or not the emblems increase the likelihood of confusion or decrease the likelihood of confusion, or what impression a consumer may have when confronted with these products, are questions of fact. Let me just examine that for a second. Okay. Reading the briefs, the WD use of the crosshairs stays consistent across the line, except for its rust remover soap where it becomes sort of egg-shaped. Okay. Mr. Sorensen's products, the crosshair jumps around, right? I mean, it's large, it's small, it's up, it's down. It doesn't have quite the same placement, does it, that the WD-40 crosshair has? I mean, what would you say is the more dominant product in appearance with regard to the crosshair? What do you mean by that, Judge, in terms of what's most dominant? Well, I mean, it's, you know, when you see a Ford with a V8, you know, the V8 in there, I mean, that's kind of a consistent use of V8 other than the juice, I guess. Right. But I guess there's no confusion there. Right. I guess it just struck me that if that's the strongest invasion of the mark, that the mark seems to jump around in size. I mean, if it was the dominant factor, which it may be in this case, it doesn't jump out in a consistent way that the WD-40 one does it. That's a good point, Judge, and it may not jump out to you. Well, no, I don't know. I'm asking, what do you think? I think it does. I think the crosshairs jump out certainly on a number of Mr. Sorensen's products. I agree, though, with Ms. Cameron. He doesn't use the crosshair on every product he's ever made, but he's used it consistently. Oh, no, I'm not questioning. Right. It's a consistent use, but I'm thinking of it as a dominant feature of the product face. It seems to vary in the viewing. That's all. Yeah. I think I'll put it this way. At least as I read it. Right. I think some jurors might say this is dominant and it jumps out. Other jurors might say, well, it's inconsistent, so it somehow devalues that. What's the derivation of V80? Well, his testimony was accurate. It's what Ms. Cameron quoted, being twice as good as WD-40, I think is what he said. I don't personally know, but that's what the testimony was. Okay. And I think I have very little time. You have another minute. I just wanted to, and there's a lot of these documents, but I'm just going to read from a document produced by WD-40 273, it's Bates labeled. It says, an example of collaboration in this space is seen in Remington's REM oil moisture guard rust preventative with TOUT's vapor phase corrosion inhibition supplied by The Inhibitor, registered trademark in the document here, premium VCI technology. The Inhibitor, registered trademark circle, VCI, see http, theinhibitor.com, is a product of Van Patten Industries in Rockford, Illinois. Armed with that information, I'm fairly certain that WD-40 could figure out who that company is and what they do and what they sell. And I think that's enough to put to a jury with regard to the crosshairs. I don't know if your honors have any other questions. Apparently not. Thank you very much. Thank you. Thanks to all counsel. The case is taken under advisement.